IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARY ELIZABETH BORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 22-cv-03726 |
| | ) | |
| GOOD NATURED PRODUCTS | ) | |
| (ILLINOIS), LLC, formerly | ) | |
| Ex-Tech Plastics, Inc. | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff, Mary Elizabeth Bord, for her Complaint against Good Natured Products (Illinois),

LLC, alleges as follows:

**JURISDICTION AND VENUE**

1.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343

as this action involves federal questions regarding the deprivation of rights under Title VII of the

Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the Age Discrimination in

Employment Act, 29 U.S.C. §§ 621-634 ("ADEA").

2.      Pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 2000e-5(f)(3), and 29 U.S.C. § 626

(c)(1), venue is proper in this district because a substantial part of the events and omissions giving

rise to this action, including the unlawful practices alleged herein, occurred in this district.

1

## PARTIES

3.      Plaintiff Mary Elizabeth Bord is a resident of the State of Wisconsin and worked for Ex-Tech Plastics, Inc. ("Ex-Tech"), now a division of Good Natured Products (Illinois), LLC ("Good Natured"), from August 29, 2011 to January 29, 2021.

4.      At all relevant times, Bord was an "employee" of Ex-Tech as defined by Title VII and the ADEA.

5.      Ex-Tech was an Illinois corporation with its principal place of business at 11413 N. Burlington Road, Richmond, Illinois 60071.

6.      Ex-Tech was in the business of extruding and recycling plastic.

7.      Good Natured is an Illinois-registered limited liability corporation with its principal place of business at 11413 N. Burlington Road, Richmond, Illinois 60071 – the same location at which Ex-Tech operated its business.

8.      Good Natured purchased the assets of Ex-Tech and Ex-Tech's affiliate, ETP, Inc. ("ETP") on May 28, 2021 for $14.1 million.  The Company now does business as "Ex-Tech, a division of good natured Products (Illinois) LLC."

9.      At all relevant times, Ex-Tech and Good Natured qualified as an "employer" within the meaning of Title VII and the ADEA.

## ADMINISTRATIVE PREREQUISITES

10.      On February 18, 2021, Bord filed a Charge of Discrimination against Ex-Tech with the United States Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR"), alleging sex discrimination under Title VII.  On May 25, 2021, Bord filed an Amended Charge of Discrimination against Ex-Tech with the EEOC and

IDHR alleging sex discrimination and retaliation under Title VII and age discrimination under the ADEA.

11.     On May 25, 2022, the EEOC issued Bord a Notice of Right to Sue.

12.     All prerequisites to the filing of this suit have been met.

## SUCCESSOR LIABLITY

13.     Good Natured has successor liability for Ex-Tech's discriminatory and retaliatory treatment of Bord in violation of Title VII and the ADEA.

14.     Good Natured had prior notice of Bord's claims against Ex-Tech.  The Asset Purchase Agreement between Good Natured and Ex-Tech required Ex-Tech to disclose administrative proceedings before any governmental entity, which included Bord's Charges of Discrimination which were pending at the time Good Natured closed on its purchase of Ex-Tech.

15.     Good Natured also had the opportunity to protect itself from liability.  Good Natured excluded certain liabilities in its purchase and obtained indemnification from Ex-Tech in its Asset Purchase Agreement with Ex-Tech.  Good Natured also entered into an Escrow Agreement with Ex-Tech that required Ex-Tech to remit an escrow amount of $1,410,000 to satisfy indemnification claims.

16.     Good Natured continued to employ many of the persons who had been employed by Ex-Tech, including members of its management team, and continued to engage in the same business of extruding and recycling plastic at the same location as Ex-Tech.

17.     Ex-Tech is no longer a going concern.  Ex-Tech changed its corporate name to ETP Asset Holdings, Inc. on June 1, 2021 – post-sale to Good Natured – and ETP Asset Holdings, Inc. was dissolved on March 11, 2022.

## FACTUAL ALLEGATIONS

### A. EQUITY COMPENSATION GIVEN TO MALE MANAGEMENT TEAM MEMBERS

18.     In January 2001, Ex-Tech offered its management team members – i.e., its President, its Vice President of Sales, Marketing, and Business Development, and its CFO, all of whom are male – 8,000 shares (at $11 per share) in Ex-Tech stock in exchange for a promissory note, with the stock dividends and other distributions paying off the note and interest on the note.

19.     The January 1, 2001 Special Buy and Sell Agreement provided to the male management team members states: "The Corporation deems it in its best interest to promote harmony in its management and operations and to provide incentives for its officer-shareholders to use their best efforts to promote the business of the Corporation."

20.     Ex-Tech also gave the male management team members an agreement that provided them severance pay (i.e., up to 12 weeks of salary for each year of service, capped at 52 weeks of pay) if Ex-Tech terminated their employment other than for cause.

21.     On January 1, 2002, Ex-Tech offered the male members of Ex-Tech's management team the opportunity to purchase 1,333 additional shares of Ex-Tech stock at $15 per share (or $20,000), for a total of 9,333 shares. Each of them accepted that offer.

22.     On January 1, 2003, Ex-Tech provided to Pat Ward, Ex-Tech's Vice President of Operations, the same stock offer as the other male management team members.

23.     Ward's Special Buy and Sell Agreement contains the *same* "harmony" clause as the January 1, 2001 Agreement provided to Ex-Tech's other male management team members.

24.     When the Ex-Tech Board approved the stock offer given to Ward, it also recognized in its Board Meeting Minutes that:

- "[T][he Corporation desires to compensate certain of its executive employees who have already rendered and are expected to render valuable services to the Corporation;"

- "[T]he Corporation also desires to structure compensation so as to provide an incentive for such executive employees to contribute to the growth and success of the Corporation;" and

- "ownership of equity interests in the Corporation causes employees to share in the Corporation's success, providing added incentives."

25.     At the same time Ex-Tech gave Ward the stock offer, Ex-tech gave Ward the same severance pay agreement it gave to the other male management team members.

26.     Ward was also given the offer to purchase 1,333 additional shares of Ex-Tech stock at $15 per share as offered to the other male management team members, but he declined it because, upon information and belief, at that time Ward did not believe it was a good deal.

27.     In 2004, when Ex-Tech formed ETP to own Ex-Tech's real estate assets, Ex-Tech gave Ward 290 shares of ETP and each of the other male members of Ex-Tech's management team 339 shares of ETP (amounts that were commensurate with their percentage holdings of Ex-Tech stock), at no cost to any of them.

**B.     BORD'S HIRE AND COMPENSATION INEQUITY**

28.     On August 29, 2011, Ex-Tech hired Bord as its Chief Financial Officer ("CFO"). Ex-Tech also made Bord an officer (Treasurer) of the Company and a member of its management team.

29.     Ex-Tech offered Bord a lower annual salary ($115,000) than what it paid to her predecessor ($140,000), a male, even though she had as much or more experience and credentials than him (e.g., CPA, CMA).

30.     Upon information and belief, Ex-Tech also offered Bord a lower annual salary than the Company was contemplating for a male candidate ($140,000, the same as her predecessor and the other male members of the management team) who was less qualified than her (e.g., his CPA license had expired).

31.     For about four years after her hire, Bord was paid a lower salary than her similarly situated male peers on the management team.

32.     In 2015, after Bord made multiple complaints, Ex-Tech finally equalized Bord's salary with her male peers on the management team.  Ex-Tech did not make Bord whole for the disparity in her pay in the previous four years.

33.     Despite her complaints, Ex-Tech never offered Bord stock or other equity compensation as provided to her male peers on the management team.  Nor did it provide her a severance pay agreement.

34.     Ward was Bord's peer throughout Bord's employment with Ex-Tech and remains employed by Good Natured.  Ward retained his stock in Ex-Tech and ETP as of the date of Good Natured's purchase of the assets of Ex-Tech and ETP in May 2021.  Ward received a substantial payout for his Ex-Tech and ETP stock as well as a portion of 6,650,000 GDNP shares allocated to the Ex-Tech/ETP shareholders.

C.     **BORD'S RENEWED EFFORTS TO OBTAIN EQUITABLE COMPENSATION**

35.     Beginning in early 2020, as CFO, Bord worked on three potential sales of Ex-Tech and ETP.  Without having stock in the companies or other equity compensation, Bord would not reap the rewards of a sale as would her male peers on the management team.

36.     In a meeting of Ex-Tech's Board of Directors that Bord attended after it promoted Brian Grayczyk to be Ex-Tech's President, John Wolff – a male Board member and one of Ex-

Tech's largest shareholders – stated that the Board needed to get Grayczyk some stock.  Wolff did not include Bord in that proposal.

37.      After the Board meeting, Bord complained to Grayczyk about not being given any stock or other equity compensation.

38.      On October 6, 2020, via text message, Bord again complained to Grayczyk about having no equity compensation when being directed by Board Chair Emily Pichon to prioritize getting Ex-Tech's $936,000 Paycheck Protection Program loan forgiven to better position Ex-Tech for sale.

39.      On October 30, 2020, Grayczyk sent Bord an email with "Stock Appreciation Plans."  The Plans provided Bord deferred compensation units equivalent to the value of 2,000 shares of Ex-Tech stock and 73 shares of ETP stock.  The Plans provided Grayczyk deferred compensation units equivalent to the value of 9,333 shares of Ex-Tech stock and 339 shares of ETP stock – the same equity compensation that Ex-Tech had previously provided to Bord's male peers on the management team (including Ward) and *five times* what the Plans provided to Bord.

40.      On November 2, 2020, Bord complained to Grayczyk about the significant disparity in the equity compensation being provided to her.  Grayczyk told Bord that Wolff stated to him that Bord deserved only $10,000-20,000 and the stock value allocated to her (2,000 shares in Ex-Tech and 73 shares in ETP) was worth about that much.

41.      Grayczyk represented to the Company's legal counsel via email on November 3, 2020 that the Stock Appreciation Plans had been approved by the Company's Board of Directors.

42.      On November 25, 2020, the Company's legal counsel sent Grayczyk and Bord "revised drafts of the Phantom Stock Plans and Award Agreements" in an email which stated, among other things, "the only outstanding item would be to insert the effective dates for both the

Plan and the Grants." The revised Plans and Agreements again provided Grayczyk about five times as much phantom stock as provided to Bord – 9,333 shares of Ex-Tech and 339 shares of ETP for Grayczyk (again equivalent to what had been previously offered to Bord's male peers on the management team) versus 2,000 shares of Ex-Tech and 73 shares of ETP for Bord.

43.     The Board approved a phantom stock plan so that Grayczyk and Bord would share in the financial benefits of a sale of the Company in a manner akin to being shareholders like the other members of Ex-Tech's management team.

44.     On December 22, 2020, the Company's legal counsel sent Grayczyk and Bord "revised Stock Plans and Award Agreements, which have been updated for the escrow holding." Counsel's email also stated, "please confirm that the payment accurately reflects what is contemplated."

45.     On January 21, 2021, Grayczyk sent an email to the Company's legal counsel stating, "Again, the goal is that we are treated the same as the rest of the shareholders in all aspects including value of the shares."

46.     The morning of January 29, 2021, as Bord still did not have an executed stock agreement and was working diligently on the potential sale of Ex-Tech and ETP to Good Natured (which was then scheduled to close on April 30, 2021), Bord handed a letter to Grayczyk, stating, among other things:

- "With the pending sale of Ex-Tech which does not include my continued employment, there is little incentive to go above and beyond as I did last fall to aid in this endeavor without some concrete award."

- "As previously expressed, the amount of 2000 phantom shares of Ex-Tech Plastics, Inc. and 73 phantom shares of ETP, which are equal to the lowest shareholder, are disappointing and nowhere in line to what was provided or offered to peers."

- "I believe those shares should be increased to become more equitable to my male counterparts and show appreciation for the efforts I have made in the success of Ex-Tech and ETP. I feel I am at a loss."

47.     In her letter, Bord asked for shares in an amount "equitable to [her] male counterparts" with a stock plan to be signed by February 15, 2021, as well as six months of severance pay or "change in control" upon the expected Company sale.

48.     In response, Grayczyk sent Bord an email at 3:09 p.m. that afternoon offering Bord a one-time bonus of $100,000, conditioned on the sale of the Company. Bord was given until "the end of business" that day, or less than two hours, to accept it.

49.     As CFO, Bord was placed in the position of having to engage in a substantial amount of work to get the Company ready for sale without equity or severance compensation equal or comparable to that provided to her similarly situated male peers. Instead of providing Bord a written guarantee of equitable equity compensation and severance pay, Bord was given an ultimatum. Grayczyk told Bord that if she did not accept the substantially less, non-negotiable one-time bonus, she could leave the company.

50.     Bord told Grayczyk that the one-time bonus offer was a "slap in the face" and that she would not accept such inequitable compensation – i.e., hundreds of thousands of dollars less than the value of Ward's stock and severance pay and hundreds of thousands of dollars less than the value of the phantom stock proposed for Grayczyk who had been Ex-Tech's president for only two years.

51.     In reply, Grayczyk told Bord to prepare a written resignation notice.

52.     Bord told Grayczyk that she was not voluntarily resigning. Grayczyk then told Bord to clean out her office that day, January 29, 2021.

53. Bord did not accept the bonus offer and cleaned out her office as directed by Grayczyk.

54. Bord never received Ex-Tech or ETP stock, phantom stock, or other equity compensation from Ex-Tech.

55. Ex-Tech replaced Bord with a substantially younger CFO.

56. In giving Bord a coercive ultimatum to take the one-time, low-ball bonus offer or leave the company, Ex-Tech tried to take advantage of Bord's age because at age 62 at that time (born 1959), Bord would have difficulty finding a comparable CFO job.

## FIRST CAUSE OF ACTION
### (Unequal compensation because of gender in violation of Title VII)

57. Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

58. Defendant violated Title VII by treating Plaintiff less favorably in stock/equity and other compensation than Ward and the other similarly situated male members of Ex-Tech's management team because of her gender.

59. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer monetary and other economic harm for which she is entitled to an award of damages, in addition to reasonable attorney's fees and costs.

60. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

61.     Defendant's unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the Title VII, warranting punitive damages.

## SECOND CAUSE OF ACTION
### (Termination because of gender in violation of Title VII)

62.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

63.     Defendant terminated or constructively terminated Plaintiff's employment because of her gender in violation of Title VII.

64.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer monetary and other economic harm for which she is entitled to an award of damages, in addition to reasonable attorney's fees and costs.

65.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

66.     Defendant's unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the Title VII, warranting punitive damages.

## THIRD CAUSE OF ACTION
### (Retaliation in Violation of Title VII)

67.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

68.     Defendant retaliated against Plaintiff in violation of Title VII for her complaint of gender-based pay inequity by refusing to offer her equitable compensation and by terminating or constructively terminating her employment.

69.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer monetary and other economic harm for which she is entitled to an award of damages, in addition to reasonable attorney's fees and costs.

70.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and other emotional pain and suffering, for which she is entitled to an award of monetary damages and other relief.

71.     Defendant's unlawful and retaliatory actions constitute malicious, willful, and wanton violations of the Title VII, warranting punitive damages.

## FOURTH CAUSE OF ACTION
### (Age Discrimination in Violation of the ADEA)

72.     Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

73.     Defendants discriminated against Plaintiff based on her age by refusing to offer her equitable compensation and by terminating or constructively terminating her employment in violation of the ADEA.

74.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and will continue to suffer monetary and/or other economic harm.

75.     Defendant's unlawful and discriminatory actions were willful and showed reckless disregard for Plaintiff's statutorily protected rights, warranting liquidated damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, through the following relief:

A.     A declaratory judgment that the actions of Defendant complained of herein violate the laws of the United States;

B.     An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

C.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and other economic damages, including but not limited to lost income and benefits;

D.      An award of damages in an amount to be determined at trial, plus prejudgment interests, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

F.      An award of punitive damages in an amount to be determined at trial;

G.      An award of liquidated damages in an amount to be determined at trial;

H.      An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: July 19, 2021                                    Respectfully submitted,

                                                        **LINDNER LAW, LLC**

                                                        By:    s/ Laura A. Lindner
                                                               Laura A. Lindner

                                                        ARDC Bar No. 6216444
                                                        648 N. Plankinton Ave. – Suite 418
                                                        Milwaukee, WI  53203
                                                        (414) 409-1242
                                                        laura@lindnerlawllc.com

                                                        *Attorneys for Plaintiff*