UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARY ELIZABETH BORD, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GOOD NATURED PRODUCTS ) <br> (ILLINIOIS), LLC, AND ) <br> ETP ASSET HOLDINGS, INC., ) <br> ) <br> Defendants. ) | Case No. 22 C 3726 <br><br> Judge Jorge L. Alonso |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Mary Elizabeth Bord ("Plaintiff") brings this lawsuit against ETP Asset Holdings, Inc. ("ETP") and Good Natured Products (Illinois), LLC ("GNP") (collectively, "Defendants"), alleging unequal compensation and termination because of gender and age in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA"), as well as retaliation in violation of Title VII. ETP has moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the motion is denied.

**I.    BACKGROUND**

The following well-pleaded factual allegations are accepted as true for purposes of the motion to dismiss. *See Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016).

From August 29, 2011 to January 29, 2021, Plaintiff worked for Ex-Tech Plastics, Inc. ("Ex-Tech"), a company that was in the business of extruding and recycling plastic. (Am. Compl. ¶¶ 3, 6, ECF No. 4.) On May 28, 2021, Defendant GNP purchased the assets of Ex-Tech

1

and Ex-Tech's affiliate, Defendant ETP, for $14.1 million. (*Id.* ¶ 8.) Ex-Tech is now ETP and does business as a division of GNP. (*Id.* ¶¶ 3, 8, 9.)

In January 2001, years before Plaintiff began working for Ex-Tech, Ex-Tech offered to three members of its management team—the President, Vice President of Sales, Marketing, and Business Development, and Chief Financial Officer ("CFO"), all of whom are male—8,000 shares (at $11 per share) in Ex-Tech stock in exchange for a promissory note, with the stock dividends and other distributions to pay off the note and interest on the note (the "Special Buy and Sell Agreement"). (*Id.* ¶ 19.) Ex-Tech also gave those same members of the management team an agreement for severance pay of up to 12 weeks of salary for each year of service, capped at 52 weeks. (*Id.* ¶ 21.)

On January 1, 2002, Ex-Tech offered each member of the management team the opportunity to purchase 1,333 additional shares of Ex-Tech stock at $15 per share (or $20,000) for a total of 9,333 shares. (*Id.* ¶ 22.) Each of them accepted the offer. (*Id.*) One year later, Ex-Tech extended the same Special Buy and Sell Agreement, severance pay agreement, and additional offer to purchase 1,333 additional shares of Ex-Tech stock to Pat Ward, Ex-Tech's Vice President of Operations. (*Id.* ¶¶ 23-27.) Mr. Ward declined the offer to purchase the 1,333 additional shares because he did not believe it was a good deal. (*Id.* ¶ 27.) In 2004, when Ex-Tech formed ETP to own Ex-Tech's real estate assets, Ex-Tech gave Mr. Ward 290 shares of ETP stock, and each of the other male members of the Ex-Tech's management team 339 shares. (*Id.* ¶ 28.) These amounts were commensurate with each person's percentage holdings of Ex-Tech stock.

On August 29, 2011, Ex-Tech hired Plaintiff as its CFO and Treasurer and member of its management team. (*Id.* ¶ 29.) Ex-Tech offered Plaintiff an annual salary of $115,000, which was

2

lower than that paid to her male predecessor ($140,000), even though she had as much or more experience and credentials than him (e.g., CPA, CMA). (*Id*. ¶ 30.) The $115,000 figure was also lower than what Ex-Tech was contemplating offering to a male candidate ($140,000, the same as her predecessor and the other male members of the management team) who was less qualified than her because his CPA license had expired. (*Id*. ¶ 31.) Plaintiff was paid a lower salary than the other male members of the management team for the next four years. (*Id*. ¶ 32.)

After Plaintiff made multiple complaints, in 2015 Ex-Tech equalized Plaintiff's salary with the other male members of the management team but did not recompense her for the four-year pay disparity. (*Id*. ¶ 33.) However, despite Plaintiff's complaints, Ex-Tech never offered her stock, other equity compensation, or a severance pay agreement—all provided to the male members of the management team. (*Id*. ¶ 34.)

Beginning in early 2020, Plaintiff worked on three potential sales of Ex-Tech and ETP. (*Id*. ¶ 36.) But without having stock or other equity compensation, Plaintiff would not reap the same rewards of a sale as the male members of the management team. (*Id*.) Sometime that year, Plaintiff attended a meeting of Ex-Tech's Board of Directors after it promoted Brian Grayczyk to President, during which John Wolff—a male Board member and one of Ex-Tech's largest shareholders—stated that the Board needed to get Mr. Grayczyk some stock. (*Id*. ¶ 37.) Mr. Wolff did not include Plaintiff in that proposal. (*Id*.) After the meeting, Plaintiff complained to Mr. Grayczyk about not being given any stock or other equity compensation. (*Id*. ¶ 38.)

Around October of 2020, Board Chair Emily Pichon directed Plaintiff to prioritize getting Ex-Tech's $936,000 Paycheck Protection Program loan forgiven in order to better position Ex-Tech for sale. (*Id*. ¶ 39.) Plaintiff again complained to Mr. Grayczyk about having no equity compensation via text message on October 6, 2020. (*Id*. ¶ 39.)

3

On October 30, 2020, Mr. Grayczyk sent Plaintiff an email with "Stock Appreciation Plans" (the "Phantom Stock Plans"). (*Id.* ¶ 40.) The Phantom Stock Plans provided Plaintiff deferred compensation units equivalent to the value of 2,000 shares of Ex-Tech stock and 73 shares of ETP stock, although they provided Mr. Grayczyk deferred compensation units equivalent to the value of 9,333 shares of Ex-Tech stock and 339 shares of ETP stock—the same equity compensation that Ex-Tech had previously provided to the male members of the management team (including Mr. Ward) and five times that provided to Plaintiff. (*Id.*) On November 2, 2020, Plaintiff complained to Mr. Grayczyk about the significant disparity in the equity compensation being provided to her. (*Id.* ¶ 41.) Mr. Grayczyk told Plaintiff that Mr. Wolff stated that Plaintiff deserved only $10,000-20,000 in stock value. (*Id.* ¶ 41.) Mr. Grayczyk notified Ex-Tech's legal counsel via email on November 3, 2020, that the Phantom Stock Plans had been approved by the Board of Directors. (*Id.* ¶ 42.) The Board approved the Phantom Stock Plans so that Mr. Grayczyk and Plaintiff would share in the financial benefits of a sale of Ex-Tech, like the other members of Ex-Tech's management team. (*Id.* ¶ 44.)

On November 25, 2020, Ex-Tech's legal counsel emailed revised draft Phantom Stock Plans to Mr. Grayczyk and Plaintiff and stated, among other things, that "the only outstanding item would be to insert the effective dates for both the Plan and the Grants." (*Id.* ¶ 43.) The revised Phantom Stock Plans did not change the amount of phantom stock provided to Mr. Grayczyk and Plaintiff, respectively. (*Id.*) On December 22, 2020, legal counsel again emailed Mr. Grayczyk and Plaintiff revised Phantom Stock Plans, "updated for the escrow holding," and requested confirmation of the payment amount. (*Id.* ¶ 45.) Mr. Grayczyk emailed legal counsel on January 21, 2021, stating in part, "Again, the goal is that we are treated the same as the rest of the shareholders in all aspects including value of the shares." (*Id.* ¶ 46.)

On the morning of January 29, 2021, Plaintiff was working on the potential sale of Ex-Tech and ETP to GNP—then scheduled to close on April 30, 2021—yet she still did not have an executed agreement as to the Phantom Stock Plans. (*Id*. ¶ 47.) Plaintiff handed a letter to Mr. Grayczyk which stated, among other things:

> With the pending sale of Ex-Tech which does not include my continued employment, there is little incentive to go above and beyond as I did last fall to aid in this endeavor without some concrete award. . . . As previously expressed, the amount of 2000 phantom shares of Ex-Tech Plastics, Inc. and 73 phantom shares of ETP, which are equal to the lowest shareholder, are disappointing and nowhere in line to what was provided or offered to peers. . . . I believe those shares should be increased to become more equitable to my male counterparts and show appreciation for the efforts I have made in the success of Ex-Tech and ETP. I feel I am at a loss.

(*Id*. ¶ 47.) Plaintiff asked for a stock plan to be signed by February 15, 2021, as well as six months of severance pay or "change in control" upon the expected sale. (*Id*. ¶ 48.) She further states that if her demand "is not acceptable, I will retrieve the personal contents of my office on Saturday, January 30th to avoid any disruption[.]" (Decl. of Andrew Scroggins Ex. A, ECF No. 7-1.)[1]

Mr. Grayczyk replied by email at 3:09 p.m. that afternoon offering Plaintiff a one-time bonus of $100,000 in lieu of the Phantom Stock Plans, conditioned on the sale of Ex-Tech and Plaintiff's employment at the time of sale, and giving Plaintiff until the "end of business" that day to accept it. (Am. Compl. ¶ 49, ECF No. 4.) Mr. Grayczyk told Plaintiff that if she did not accept the non-negotiable bonus, she could leave the company. (*Id*. ¶ 50.) As CFO, Plaintiff

---

[1] Although the letter was quoted in part in the Amended Complaint, it was neither quoted, nor attached thereto, in full. On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court may consider "documents that are critical to the complaint and referred to in it[.]" *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013) (citations omitted). Regardless of whether the full letter is "critical," however, the Court's conclusion set forth below would not change even if it considered only those parts of the letter that are quoted in the Amended Complaint.

engaged in a substantial amount of work to get Ex-Tech ready for sale without equity or severance compensation equal or comparable to her male peers. (*Id*.) Plaintiff responded that the offer was a "slap in the face" and that she would not accept such inequitable compensation, which was hundreds of thousands of dollars less than the value of Mr. Ward's stock and severance pay and the value of phantom stock offered to Mr. Grayczyk after serving only two years as President. (*Id*. ¶ 51.) Mr. Grayczyk told Plaintiff to prepare a written resignation notice. (*Id*. ¶ 52.) When Plaintiff responded that she was not voluntarily resigning, Mr. Grayczyk told her to clean out her office that day. (*Id*. ¶ 53.) Plaintiff did not accept the bonus offer and cleaned out her office as directed. (*Id*. ¶ 54.) She never received Ex-Tech or ETP stock, phantom stock, or other equity compensation from Ex-Tech. (*Id*. ¶ 55.)

Ex-Tech replaced Plaintiff with a substantially younger CFO. (*Id*. ¶ 56.) Plaintiff alleges that in giving Plaintiff a "coercive ultimatum to take the one-time, low-ball bonus offer or leave the company," Ex-Tech tried to take advantage of Plaintiff's age (then 62) because she would have difficulty finding a comparable CFO job. (*Id*. ¶ 57.)

In May 2021, GNP purchased Ex-Tech and ETP. (*Id*. ¶ 35.) Mr. Ward, who Plaintiff alleges was her "peer" throughout her employment at Ex-Tech and remains with GNP, received a substantial payout for his Ex-Tech and ETP stock, as well as a portion of 6,650,000 GNP.[2] shares allocated to Ex-Tech/ETP shareholders. (*Id*.)

On February 18, 2021, Plaintiff filed a Charge of Discrimination against Ex-Tech with the United States Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR"), alleging sex discrimination under Title VII. (*Id*. ¶ 11.)

---

[2] While the Amended Complaint alleges Mr. Ward received a portion of "6,650,000 GDNP shares," the Court infers that "GDNP" is a scrivener's error and should state "GNP." (*Id*. ¶ 35.)

On May 25, 2021, Plaintiffs filed an Amended Charge of Discrimination against Ex-Tech with the EEOC and IDHR alleging sex discrimination and retaliation under Title VII and age discrimination under the ADEA. (*Id.*) The EEOC issued a Notice of Right to Sue on May 25, 2022. (*Id.* ¶ 12.)

Plaintiff's Amended Complaint in this case pleads four causes of action against ETP and GNP. First, Plaintiff alleges that Defendants violated Title VII by treating Plaintiff less favorably in stock, equity, and other compensation than Mr. Ward and other similarly situated male members of Ex-Tech's management team because of her gender. Second, Plaintiff alleges that Defendants terminated or constructively terminated Plaintiff's employment because of her gender in violation of Title VII. Third, Plaintiff alleges that Defendants retaliated against her in violation of Title VII for her complaint of gender-based pay inequity by refusing to offer her equitable compensation and by terminating or constructively terminating her employment. Fourth, Plaintiff alleges that Defendants discriminated against her based on her age by refusing to offer her equitable compensation and by terminating or constructively terminating her employment in violation of the ADEA.

Plaintiff alleges that GNP has successor liability for Ex-Tech's actions. (*Id.* ¶ 14.) GNP allegedly had prior notice of Plaintiff's claims because the Asset Purchase Agreement between GNP and Ex-Tech required Ex-Tech to disclose administrative proceedings before any governmental entity, which included Plaintiff's Charges of Discrimination pending at the time of the sale. (*Id.* ¶ 15.) GNP also had the opportunity to protect itself from liability because it excluded certain liabilities in its purchase and obtained indemnification from Ex-Tech. (*Id.* ¶ 16.) GNP entered into an Escrow Agreement with Ex-Tech that required Ex-Tech to remit an escrow amount of approximately $1.41 million to satisfy indemnification claims, which is now held by

ETP. (*Id.* ¶¶ 16, 18.) GNP continued to employ many people employed by Ex-Tech, including members of the management team, and continued to engage in the same business of extruding and recycling plastic at the same location as Ex-Tech. (*Id.* ¶ 17.)

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions under Title VII and the ADEA. (*Id.* ¶¶ 3-4.)

## II.     LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557 (internal quotation marks omitted)).

When considering a motion to dismiss, courts "accept the allegations in the complaint as true, and . . . draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 307 (7th Cir. 2021) (citation omitted). But "allegations in the form of legal conclusions are insufficient" to survive a motion to dismiss, as are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Def. Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 334 (7th Cir. 2015) (citations and internal quotation marks omitted).

8

III.    ANALYSIS

A. Administrative Exhaustion

ETP argues that any claim against GNP should be dismissed for failure to exhaust administrative remedies by filing a charge with the EEOC. As the argument goes, the Amended Complaint only alleges that Plaintiff filed charges with the EEOC against Ex-Tech and that Ex-Tech is now ETP, but she did not file an EEOC charge against GNP, was never employed by GNP, and so may not sue that company. ETP is in the dubious position of arguing for the dismissal under Federal Rule of Civil Procedure 12(b)(6) of claims against another defendant, GNP, despite the fact that GNP itself makes no such argument and instead filed an answer in this case. Even setting this aside, ETP's argument fails on the merits.

Before filing suit under Title VII or the ADEA, an individual must first exhaust her administrative remedies by filing a charge with the EEOC. *Miller v. Am. Airlines, Inc.*, 525 F.3d 520, 525 (7th Cir. 2008) (ADEA); *Conner v. Ill. Dep't of Nat. Res.*, 413 F.3d 675, 680 (7th Cir. 2005) (Title VII). Failure to name a party in a charge filed with the EEOC typically precludes that party from being named as a defendant in a Title VII lawsuit. *Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 905 (7th Cir. 1981). There are, however, recognized exceptions to this rule. *Id*. For example, "where an unnamed party has been provided with adequate notice of the charge, under circumstances where the party has been given the opportunity to participate in conciliation proceedings aimed at voluntary compliance, the charge is sufficient to confer jurisdiction over that party." *Id.*; *see also Triplett v. Midwest Wrecking Co.*, 155 F.Supp.2d 932, 937 (N.D. Ill. 2001) (citing *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 126 (7th Cir. 1989)). Although both litigants and courts have in the past discussed administrative exhaustion requirement in terms of "jurisdiction," the Supreme Court more

recently clarified that "Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of courts." *Fort Bend Cty., Tex. v. Davis*, 139 S. Ct. 1843, 1851 (2019).

Plaintiff argues that she has met this notice exception, pointing to correspondence between her counsel and GNP's counsel regarding her then-pending EEOC charge and any interest that GNP might have "in exploring a pre-litigation resolution." (Pl's Brief in Opp'n to Def.'s Mot. to Dismiss 3 (citing Decl. of Laura Lindner, attached as Ex. 1 thereto).) ETP argues only that the Court may not consider the declaration or email exchange attached thereto because they were submitted with Plaintiff's opposition brief but not attached to the Amended Complaint.

On a motion to dismiss under Rule 12(b)(6), the Court considers "not only 'the complaint itself,' but also 'documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice'" as well as "additional facts set forth in [briefing], so long as those facts are 'consistent with the pleadings.'" *Phillips*, 714 F.3d at 1019-20 (citations omitted). Additionally, "a party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove" without converting the motion into a Rule 56 motion for summary judgment. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir. 2012).

Here, the facts set forth in the declaration and email exchange attached to Plaintiff's opposition illustrate facts Plaintiff expects to be able to prove and are consistent with the pleadings themselves. Plaintiff's Amended Complaint expressly alleges that GNP "had prior notice of Bord's claims against Ex-Tech" because the Asset Purchase Agreement between GNP and Ex-Tech required Ex-Tech to disclose administrative proceedings before any governmental entity, which included Plaintiff's then-pending EEOC charges. (Am. Compl. ¶ 15, ECF No. 4.)

10

Plaintiff further alleges that GNP had the opportunity to protect itself from liability by excluding certain liabilities in its purchase, entering into an indemnification agreement with Ex-Tech, and entering into an Escrow Agreement that required Ex-Tech (now ETP) to remit an escrow amount of $1.41 million to satisfy indemnification claims. (*Id.* ¶ 16.) The email exchange in which Plaintiff's counsel offered GNP's counsel the opportunity to explore pre-litigation resolution of Plaintiff's then-pending EEOC charge is not inconsistent with these allegations.

In *Schnellbaecher*, a parent company was dismissed after it was not named in an EEOC charge because, although the parent company was aware of the EEOC charge against its subsidiary company, it was not aware of the charge against itself. *Schnellbaecher*, 887 F.2d at 127. Here, by comparison, Plaintiff's counsel was clear as of April 2022 in stating Plaintiff's position that GNP was subject to successor liability for the claims against Ex-Tech. (*See* Decl. of Laura Lindner at ECF p. 7 of 8, ECF No. 11-1.) Plaintiff did not file the lawsuit until July 2022, so GNP's counsel was plainly given adequate notice and the opportunity to resolve the dispute and made no effort to do so. (*Id.*)

For these reasons, the failure to name GNP as a party in the charge filed with the EEOC does not preclude GNP from being sued in this Title VII lawsuit.

**B. Unequal Compensation Because of Gender (Count I)**

ETP argues that Plaintiff's claims of unequal compensation because of gender are either untimely, fail to allege an adverse employment action, or fail to allege similarly situated men were paid more.[3] The Court addresses each argument in turn.

---

[3] Although ETP makes one cursory statement that Plaintiff fails to state a claim of unequal compensation on account of age (Count IV), it makes no argument in this regard and so the Court does not address that issue here. *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1335 (7th Cir. 1995) ("The federal courts will not invent legal arguments for litigants."), *as amended* (Apr. 7, 1995).

### i. Timeliness

The Court begins with the threshold issue of timeliness. ETP first argues that Plaintiff's allegations regarding an alleged disparity in annual salary for the first four years are untimely because, per Plaintiff's own allegations, her salary was "equalized" to her peers in 2015. Title VII sets forth a limitations period of 300 days preceding the filing of the charge. 42 U.S.C. § 2000e-5(e)(1). Plaintiff filed her initial EEOC charge against Ex-Tech on February 18, 2021 (Am. Compl. ¶ 11, ECF No. 4.) Accordingly, the limitations period began on April 24, 2020, and so Plaintiff's disparate salary allegations fall outside the scope of the limitations period.

Plaintiff, however, does not dispute that claims based upon her salary disparity from 2011 to 2015 would be untimely. She argues instead that evidence of such disparity and her efforts to achieve parity with her male peers is relevant background evidence and shows the gender bias that pervaded her treatment at ETP from the beginning of her employment. She argues that a factfinder can consider her salary disparity in determining whether the lack of equity compensation was part of a pattern of compensating her less than her male peers. Plaintiff is correct that where a plaintiff "timely alleges a discrete discriminatory act, acts outside of the statutory time frame may be used to support that claim." *Kellogg v. Ball State Univ.*, 984 F.3d 525, 529 (7th Cir. 2021) (internal citations and quotation marks omitted). The main question then is whether Plaintiff's claims for disparate equity compensation allege any discrete discriminatory act within the limitations period.

ETP argues that Plaintiff's claims regarding disparity in equity compensation are untimely because Ex-Tech's stock offers to male management team members took place in 2001, 2002, 2003 and 2004—well before the limitations period and before Plaintiff was employed by Ex-Tech. ETP further argues that the continuing violations doctrine does not save Plaintiff's

claims because that doctrine is limited to paycheck accrual cases, and that Title VII claims cannot be based merely on an employer's refusal to rectify the consequences of time-barred violations.

ETP's arguments miss the mark. Under Title VII, an actionable "unlawful employment practice occurs, with respect to discrimination in compensation . . . , [1] when a discriminatory compensation decision or other practice is adopted, [2] when an individual becomes subject to a discriminatory compensation decision or other practice, or [3] when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." 42 U.S.C.A. § 2000e-5(e)(3)(A); *see also Kellogg*, 984 F.3d at 529.

Here, Ex-Tech enacted the Special Buy and Sell Agreement in January 2001, far before the limitations period of this case. Ex-Tech made additional offers or grants of equity compensation to members of the management team, who were male, in 2002, 2003, and 2004. When Plaintiff was hired as Ex-Tech's CFO and Treasurer in August 2011 (again well before the limitations period), Ex-Tech offered her a lower annual salary ($115,000) than that paid to her predecessor and that contemplated for a male candidate ($140,000), both of whom were less experienced and credentialed than her. The other male members of the management team were also paid an annual salary of $140,000. After Plaintiff made multiple complaints, Ex-Tech equalized Plaintiff's salary in 2015. Despite her complaints, however, Ex-Tech never offered Plaintiff stock or other equity compensation.

In 2020, when Grayczyk was promoted as Ex-Tech's President, Wolff, a male Board member, stated at a meeting that the Board needed to get Grayczyk some stock. Plaintiff complained after the meeting to Grayczyk about not being given any stock or other equity

compensation. Plaintiff again complained to Grayczyk in October 2020—within the limitations period—via text message about having no equity compensation when she was directed to prepare Ex-Tech for sale. Later that month, Ex-Tech offered the Phantom Stock Plans to Plaintiff and Grayczyk, but Grayczyk stood to receive equity compensation that was five times that offered to Plaintiff. Plaintiff complained of the disparity to Grayczyk on November 2, 2020—again within the limitations period. Then on January 29, 2021, Plaintiff again complained to Grayczyk of the lower equity amount offered to her in comparison to her male peers and requested that the shares be increased. In response, Ex-Tech offered a one-time bonus of $100,000—an amount that was again significantly less than the equity compensation provided to the others—and was given less than two hours to accept or she could leave the company. When Plaintiff refused, her employment terminated that same day.

Because Plaintiff's allegations of a lower salary fall outside the limitations period, ETP is correct that this is not a strict paycheck accrual case akin to *Reese v. Ice Cream Specialties, Inc.*, 347 F.3d 1007, 1012 (7th Cir. 2003). (*See* Mot. to Dismiss 9-10.) But Plaintiff's Title VII claim is based on other actions that took place within the limitations period, even if those actions were sometimes implicit denials of her requests for equal treatment. The fact that Plaintiff relies on actions Ex-Tech took toward male comparators outside the limitations period does not sink her claim so long as Ex-Tech took discrete discriminatory actions *toward her* within the limitations period. *Groesch v. City of Springfield*, 635 F.3d 1020, 1029 (7th Cir. 2011) (finding the discriminatory compensation decision at issue was the "implicit denial" of the white police officers' timely "request for the same prior service credit" that had been given to a black police officer outside the limitations period).

Plaintiff made express requests to Ex-Tech for equal offers of equity compensation, which were, at various times, both implicitly and expressly denied. Interpreting the allegations in Plaintiff's favor, several of those requests and denials were made within the limitations period, and each denial—made on the basis that Plaintiff is a woman—constitutes a timely discrete discriminatory compensation decision. *See* 42 U.S.C.§ 2000e-5(e)(3)(A) (an "unlawful employment practice" occurs "when a discriminatory compensation decision or other practice is adopted" or "when an individual becomes subject to a discriminatory compensation decision or other practice"). As it turns out, the answer is simpler than ETP would have it, and Plaintiff adequately alleges timely claims for unequal equity compensation.

ETP's reliance on *Carter v. West Publishing Co.*, 225 F.3d 1258, 1263 (11th Cir. 2000)—the only case it cites involving unequal pay allegations based upon stock offerings—is not well taken. In addition to not being binding upon this Court, it is questionable whether *Carter*'s holding—namely, that dividend payments are mere neutral, nondiscriminatory consequences of a past, untimely discriminatory decision not to offer stock to female employees—withstands scrutiny in light of the later amendment to Title VII overturning a Supreme Court opinion with a similar holding. *See* 42 U.S.C.§ 2000e-5(e)(3)(A); *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618 (2007) (holding that continuing effects of past employment decisions adopted with discriminatory intent do not transform a subsequent neutral employment act into a present violation). In any event, *Carter* is otherwise distinguishable because there was no denial of an explicit request for equal stock offerings during the applicable limitations period at issue.

### ii. Adverse Employment Action and Similarly Situated Employees

"Title VII makes it unlawful for an employer to 'discriminate against any individual with respect to his compensation . . . because of such individual's . . . sex.'" *Kellogg*, 984 F.3d at 528

(quoting *Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 909 (7th Cir. 2017)). The "legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Seventh Circuit has removed the "rat's nest of surplus 'tests'" once utilized in employment discrimination cases in this circuit and held that "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. . . . All evidence belongs in a single pile and must be evaluated as a whole." *Id*. at 765-66.

Here, Plaintiff alleges that male members of the management team received higher compensation than her because she is a woman. ETP calls upon the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Ortiz*, 834 F.3d at 766 (finding the *McDonnell Douglas* framework is consistent with its holding that all evidence must be evaluated as a whole). Under that framework, to establish a prima facie case of sex discrimination under Title VII, a plaintiff "must show that 1) she was a member of a protected class, 2) she was meeting her employer's legitimate expectations, 3) she suffered an adverse employment action, and 4) the employer treated a similarly situated man more favorably." *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 704 (7th Cir. 2003) (citations omitted).

ETP argues that Plaintiff suffered no adverse employment action because her compensation was not changed and she was not denied any benefit, as the Phantom Stock Plans were never finalized or executed. ETP's argument rings hollow. For the reasons explained above, Plaintiff adequately alleges that she made multiple requests for equity compensation equal to the male members of the management team, each of which ETP denied because she is a woman.

Each denial constitutes a discrete discriminatory compensation decision sufficient to allege an adverse employment action.

ETP also argues that Plaintiff fails to allege that another similarly situated employee received better treatment than her. ETP argues that the Phantom Stock Plans contemplated providing equity compensation to only Grayczyk and Plaintiff, but Grayczyk, as President, held a very different role from Plaintiff as CFO and Treasurer. "At the very heart of an unequal pay claim is the plaintiff's burden to show unequal pay for *equal* work." *Palmer v. Ind. Univ.*, 31 F.4th 583, 590 (7th Cir. 2022) (emphasis original). "[W]hether employees are similarly situated is a 'flexible, common-sense, and factual' inquiry." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225-26 (7th Cir. 2017) (citing *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012)). "Relevant factors include 'whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision.'" *Id*. (quoting *Warren v. Solo Cup Co.*, 516 F.3d 627, 6310 (7th Cir. 2008)). Because Plaintiff has adequately alleged "timely . . . discrete discriminatory act[s,] acts outside of the statutory time frame may be used to support that claim." *Kellogg*, 984 F.3d at 529.

ETP draws too narrow a boundary around Plaintiff's allegations regarding similarly situated men. Plaintiff, a member of the management team as CFO and Treasurer, alleges that similarly situated male members of the management team, including the former CFO, all received the same salary and equity compensation as each other. When Plaintiff was hired as CFO and Treasurer, she was offered a lower salary and no equity compensation despite having more experience and credentials than the prior CFO. When a new (male) President was

promoted, he was offered equity compensation of equivalent value to the other male members of the management team. It was only after years of complaining that Plaintiff was offered equity compensation—at a value five times less than the other male members of the management team. At this stage, Plaintiff adequately alleges a similarly situated man received higher compensation than her.

### C. Termination Because of Gender (Count II) or Age (Count IV)

"Title VII makes it unlawful for an employer to terminate an employee because of her sex, . . . and the ADEA makes it unlawful for an employer to terminate an employee because of her age." *O'Regan v. Arb. Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citing 42 U.S.C. § 2000e-2(a)(1); 29 U.S.C. § 623(a)). ETP argues that Plaintiff fails to adequately allege that she was either actually or constructively discharged.

Plaintiff adequately alleges that she was actually discharged. Plaintiff alleges that she handed Grayczyk a letter on January 29, 2021, demanding equity compensation equal to the other (male) members of the management team, among other things. The letter states that if her demand "is not acceptable, I will retrieve the personal contents of my office on Saturday, January 30th to avoid any disruption . . . ." (Decl. of Andrew Scroggins Ex. A, ECF No. 7-1.) In response, Grayczyk sent her an email at 3:09 p.m. offering Plaintiff a one-time bonus of $100,000 in lieu of the Phantom Stock Plans, conditioned on the sale of the Company and Plaintiff's continued employment as of the date of the sale. Grayczyk told her that if she did not accept the non-negotiable one-time bonus by the end of business that day, in less than two hours, she could leave the company. Plaintiff responded to Grayczyk that the bonus offer was a "slap in the face" and that she would not accept such inequitable compensation. Grayczyk told Plaintiff to prepare

18

a written resignation notice, to which Plaintiff responded that she was not voluntarily resigning. Grayczyk told Plaintiff to clean out her office that same day, January 29, 2021. Plaintiff did so.

Plaintiff's letter can be viewed as something less than a full-blown resignation and more akin to a conditional resignation or offer of resignation, effective only upon acceptance of the outlined terms. Grayczyk did not accept Plaintiff's terms but instead counteroffered, informing Plaintiff that if the counteroffer was not accepted, she could leave the company. When Plaintiff did not accept Grayczyk's counteroffer, Grayczyk told her to submit a written resignation, but Plaintiff told Grayczyk she was not voluntarily resigning. At that point, Ex-Tech had the choice to have Plaintiff continue working or terminate her employment. Grayczyk chose the latter option and told Plaintiff to leave immediately—one week earlier than Plaintiff would have if she had left under the terms of her conditional resignation. And even if Plaintiff's letter were considered a full resignation, at the least, Plaintiff attempted to withdraw it before she even left the office that day. *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 435 (7th Cir. 1987) ("The terms on which resignations may be withdrawn may be implicit parts of the relations between [an employer] and its employees, and [an employee] is entitled to an opportunity to demonstrate that he could have remained at the firm."). In short, a factfinder could find that Grayczyk did not accept Plaintiff's conditional resignation on its terms and so it was never effected or that Plaintiff withdrew her resignation. Construing the allegations in Plaintiff's favor at this stage of the proceedings, Plaintiff adequately alleges that Grayczyk terminated Plaintiff's employment. The Court need not decide whether Plaintiff adequately alleges constructive discharge.

### D. Retaliation Because of Gender (Count III)

Title VII protects an employee from discrimination when "[s]he has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a). ETP

argues that Plaintiff's retaliation claims under Title VII fail because: (1) any alleged unlawful employment practices based on unequal pay are untimely, *supra*, and so she could not have complained of any such unlawful practices during the applicable limitations period; (2) Plaintiff fails to allege any adverse employment action, *supra*; and (3) even if she alleges an adverse employment action, she fails to allege any causal connection between it and her complaints because too much time passed between her first complaint in early 2020 and her last day of employment on January 29, 2021.

Having found that Plaintiff adequately alleges a timely unlawful employment practice based on unequal pay and actual discharge, ETP's first two arguments are easily dealt with. As for causal connection, ETP's argument fails because Plaintiff's latest complaint and demand for equal equity compensation to her "male counterparts" occurred on January 29, 2021—the same day that Grayczyk denied her request and terminated her employment. *Sitar v. Ind. Dep't. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (an employee "need not use magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections;" she need only "say something to indicate her [gender] is an issue").

Accordingly, Plaintiff adequately states a claim for retaliation because of gender.

IV.  **CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss [7] is denied.

**SO ORDERED.**                                              ENTERED: July 19, 2023

                                                                                         _____
                                                                                         **HON. JORGE ALONSO**
                                                                                         **United States District Judge**